## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **DOUGLAS G. HOKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:11-0643** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties'

cross-Motions for Judgment on the Pleadings (Document Nos. 13 and 17.), Plaintiff's Response

(Document No. 18.), and Plaintiff's Notice of Supplemental Legal Authority. (Document No. 19.)

Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document

Nos. 8 and 9.)

The Plaintiff, Douglas G. Hoke, (hereinafter referred to as "Claimant"), filed an application

for DIB on October 10, 2008 (protective filing date), alleging disability as of June 5, 2006, due to

"arthritis in all major joints."[1] (Tr. at 15, 148-51,158, 162.) The claim was denied initially and on

reconsideration. (Tr. at 75-77, 80-82.) On March 13, 2009, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 87.) The hearing was held on March 16, 2010, before the

---

[1] Claimant alleged that his impairments limited his ability to work because he could not be
on his "feet for any amount of time due to the pain in [his] ankles and knees." (Tr. at 162.) He also
alleged that he was "limited with [his] shoulder with reaching." (*Id.*)

Honorable R. Neely Owen. (Tr. at 28-72.) By decision dated April 20, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-23.) The ALJ's decision became the final decision of the Commissioner on July 26, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On September 20, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the

claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since his alleged onset date, June 5, 2006. (Tr. at 17, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "osteoarthritis and allied disorders, ankle status post ORIF with mild post traumatic arthritis, and bilateral shoulder arthralgias." (Tr. at 17, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for less than a full range of light work, as follows:

> [S]ince June 5, 2006, the [C]laimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b). Specifically, he could only occasionally participate in postural activities, avoid even moderate exposure to hazards, and avoid concentrated exposure to extreme cold, wetness, humidity, vibrations, and fumes.

(Tr. at 20, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 22, Finding No. 6.) Pursuant to Medical-Vocational Rule 202.10, the ALJ found that prior to May 3, 2009, Claimant was not disabled. (Tr. at 22-23, Finding No. 10.) On this basis, benefits were denied prior to May 3, 2009. (Id.) Beginning on May 3, 2009, six months prior to the date Claimant's age category changed, the ALJ found pursuant to Medical-Vocational Rule 202.01, that Claimant was disabled. (Tr. at 23, Finding No. 11.) On this basis, benefits were granted from May

3, 2009. (Tr. at 23, Finding No. 12.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on November 3, 1954, and was 55 years old at the time of the administrative hearing, March 16, 2010. (Tr. at 34, 148.) Claimant has a tenth grade, or limited education and was able to communicate in English. (Tr. at 22, 35, 40, 166.) In the past, he worked as a construction laborer, painter, farm laborer, and saw mill laborer. (Tr. at 22, 60-61, 162-64.)

 Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence

4

because the ALJ erred in not finding that he was disabled prior to May 3, 2009. (Document No. 14 at 8-12.) Citing SSR 83-20, Claimant asserts that the evidence of record, including the medical and work history, supports a finding that Claimant became disabled on June 5, 2006, his alleged onset date. (Id. at 9.) Claimant further asserts that Dr. Bundy submitted a clarification which indicated that his opinion dated back to his August 2006, examination, and that the ALJ should have considered the same and found Claimant disabled as of his alleged onset date. (Id.)

Claimant also alleges that the ALJ's decision is not supported by substantial evidence because he erred in rejecting the opinion of Claimant's treating physician. (Document No. 14 at 12-15.) Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in relying on Medical-Vocational Rule 202.10 to find that he was not disabled prior to May 3, 2009, despite finding that he could perform less than a full range of light work. (Id. at 16.) Finally, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that his statements regarding the intensity, persistence, and limiting effects were not credible. (Id. at 16-18.)

In response, the Commissioner asserts that the ALJ's decision that Claimant was not disabled prior to May 3, 2009, is supported by substantial evidence of record. (Document No. 17 at 14-20.) Specifically, the Commissioner asserts that Claimant was disabled as of May 3, 2009, due to a change in age category on the Medical-Vocational Guidelines. (Id. at 16.)  Respecting the period from June 5, 2006, through May 3, 2009, the Commissioner asserts that Dr. Bundy's treatment notes support the ALJ's determination that he was capable of performing light exertional level work. (Id. at 16-17.) The Commissioner points out that Claimant was responsive to medication. (Id.) The Commissioner asserts that the ALJ properly gave little weight to Dr. Bundy's opinion because it was inconsistent with Claimant's response to treatment. (Id. at 17-18.) Furthermore, Dr. Bundy's opinion was inconsistent

5

with the opinions of Drs. Weldman and Beard, as well as the state agency physicians. (Id. at 18-19.) Accordingly, the Commissioner asserts that the ALJ's decision is supported by substantial evidence of record and that Claimant's arguments are without merit. (Id.)

In Reply, Claimant asserts that the ALJ ignored the opinion of Dr. Wirts that supported significant manipulative limitations, and argues that the ALJ erred in failing to find limitations in Claimant's ability to manipulate his hands, arms, and shoulders. (Document No. 18 at 2-4.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it below in relation to Claimant's arguments.

**Dr. Earl Dwight Bundy, D.O.**:

Claimant began treatment with Dr. Bundy at the age of 50, on December 1, 2004, at the Robert C. Byrd Clinic, for complaints of hypothyroidism, joint pain, erectile dysfunction, and ventral and inguinal hernias. (Tr. at 277.) Dr. Bundy prescribed Naprosyn 500mg for joint pain, ordered blood work, and directed that he return in two weeks. (Id.) Dr. Bundy's next treatment record is dated May 1, 2006, and he noted that Claimant "has not been seen by me in a few years." (Tr. at 276, 342.) Claimant reported dull, occasional chest pain, as well as multiple joint pains in his elbows, ankles, and knees. (Id.) Claimant had been on Vioxx and Naprosyn in the past but was worried about stomach problems, though he had no nausea or vomiting and had a good appetite. (Id.) Claimant reported that he smoked a pack of cigarettes per day and drank a fifth of alcohol per weekend. (Id.)

On examination, Claimant reported a moderate amount of pain with overhead lifting of both arms and tenderness in both elbows, with an inability to extend fully both elbows secondary to stiffness. (Tr. at 276, 342.) Dr. Bundy noted crepitus in his knees. (Id.) He diagnosed hypothyroidism, osteoarthritis, erectile dysfunction, chronic tobacco use, and thoracic pain. (Id.) He prescribed Cialis

6

20mg and enteric coated Naprosyn 500 mg for his joint pain. (Id.)

Claimant returned to Dr. Bundy on August 15, 2006, with complaints of intense pain with all of his joints. (Tr. at 274, 340.) Dr. Bundy noted that the Naprosyn had "not made any difference whatsoever in his joint pain." (Id.) Claimant reported that his ankles, knees, and elbows were extremely painful and that he was having a lot of difficulty maintaining his employment as a construction worker due to the pain. (Id.) He also reported that his ankles were swollen, more so on the right secondary to trauma from a prior motorcycle accident. (Id.) On examination, Claimant was unable to extend his elbows through the last ten degrees of extension due to stiffness, and he was unable to clinch his hands. (Id.) Dr. Bundy noted a lot of crepitus in the right knee, swelling in the right ankle, and tenderness to range of motion of the lower extremities. (Id.) He assessed arthritis, trauma of the right ankle, chronic instability of the right ankle, family history of rheumatoid arthritis, and erectile dysfunction. (Id.) Dr. Bundy stopped the Naprosyn and gave Claimant samples of Celebrex 200mg for a couple of weeks. (Id.) Claimant explained that he was applying for social security benefits. (Id.) Dr. Bundy ordered laboratory tests to rule out rheumatoid arthritis. (Id.) The Rheumatoid Arthritis Factor was in the normal range and the Sed Rate was normal too. (Tr. at 242-43, 273.)

Two weeks later on August 29, 2006, Dr. Bundy noted that Claimant did "quite well" on the Celebrex. (Tr. at 273, 339.) Claimant stated that he had done the best he ever had on the medication but that if he stayed on his feet, the medication wore off and his joints began to bother him as the day progressed. (Id.) Claimant declined a prescription for Celebrex because of its excessive price and his lack of insurance. (Id.) Dr. Bundy therefore, substituted Naprosyn Sodium 500mg twice a day along with Tramadol 50mg twice a day for breakthrough pain. (Id.) Examination revealed crepitus in the bilateral knees, decreased range of motion of the bilateral shoulders especially in overhead lifting and rotation, and some crepitus. (Id.) Dr. Bundy assessed severe osteoarthritis and noted that as a

7

construction worker, it was "getting harder and harder for [Claimant] to stay on the job with this pain." (Id.) Claimant was directed to return in three months. (Id.)

On November 7, 2006, Claimant was examined by Dr. M. Richmond, D.O., at the Clinic for his three-month follow-up visit. (Tr. at 272, 338.) Claimant reported that he had some relief with the Naprosyn and a lot of relief with the Tramadol but was afraid to use it. (Id.) Dr. Richmond counseled Claimant to take the Tramadol on an as needed basis. (Id.) Dr. Richmond recommended moist heat, physical therapy, and a repeated rheumatoid panel. (Id.) Claimant returned to the Clinic on February 7, 2007, and Dr. Bundy advised that his lab work was normal except for increased triglycerides and cholesterol. (Tr. at 271, 337.) Claimant had no other complaints and there was no swelling noted on examination. (Id.) Claimant returned on May 7, 2007, for a follow-up on his hyperlipidemia and hypothyroidism. (Tr. at 270, 336.) Claimant again had no complaints, and there was no mention of any joint pain. (Id.) On September 7, 2007, Claimant reported some anterior chest wall pain that radiated down into his midaxillary line, from where he smokes. (Tr. at 269, 335, 365.) Dr. Bundy noted that he did not see any problems but ordered x-rays and directed that he return in four months. (Tr. at 269, 335, 347.)

On January 7, 2008, Claimant reported occasional tenderness on the right side of his chest when he took a deep breath, when seated, or after a big meal. (Tr. at 334, 364.) Dr. Bundy observed no tenderness or spasms, and his lungs were clear. (Id.) He assessed hyperlipidemia, hypothyroidism, and occasional intercostal muscle spasm, for which he prescribed Robaxin 500mg and refilled Lovastin and Synthroid. (Id.) Claimant returned for a six-month follow-up visit with Dr. Bundy on July 7, 2008, and complained of pain in his knees, shoulders, and ankles bilaterally that worsened throughout the day. (Tr. at 333, 363.) Claimant reported that the pain was unbearable and prevented him from working and keeping a job. (Id.) He had stopped taking his arthritis medication because it was not working. (Id.)

8

Claimant reported that he did not mind taking a new medication if it did not bother his stomach, but that he did not like to take medication if he did not need it. (Id.) Dr. Bundy advised Claimant to discontinue the Naprosyn and to begin taking Meloxicam 15mg once a day and Propoxyphene Acetaminophen as needed for breakthrough pain. (Id.)

On October 7, 2008, Claimant reported "how well" he was doing with the Meloxicam and the Propoxyphene, Tylenol, Darvocet combo. (Tr. at 332, 362.) Claimant stated that he did not fill the prescription for Tylenol due to the cost. (Id.) Claimant reported that as a painter, his hands and shoulders got sore as he worked. (Id.) Dr. Bundy therefore, gave him samples of Voltaren gel to use, which gave him relief in the exam room. (Id.) Dr. Bundy recommended that Claimant watch his diet due to his triglycerides and that he continue his Omega 3 Fish Oil. (Id.)

Claimant returned to Dr. Bundy on February 10, 2009, and requested that Dr. Bundy change his arthritis medication as the Meloxicam was not working. (Tr. at 406.) Dr. Bundy changed his arthritis medication to Meclomen 100mg twice a day and discussed with Claimant the need to change his diet and lose weight or he might end up on medication for diabetes. (Id.)

### *Treatment with Dr. Bundy after the ALJ Determined that Claimant was Entitled to Benefits*:

On June 10, 2009, Claimant reported to Dr. Bundy that he continued to have a lot of pain in his hands, ankles, knees, hips, and shoulders. (Tr. at 405.) Claimant stated that he presently was working as a painter and was having to sit on a stool while he paints. (Id.) On exam, Dr. Bundy observed bilateral knee crepitus and stiffness and decreasing range of motion. (Id.) Claimant could not lift his arms past parallel with the floor and had problems with internal and external rotation and stiffness. (Id.) Dr. Bundy gave Claimant a glucometer to monitor his blood sugar before and after meals. (Id.) Dr. Bundy noted that he had attempted to contact Claimant's attorney to get paperwork

for his Social Security disability evaluation. (Id.) On September 30, 2009, Claimant reported mid-back pain that sometimes radiated to his right lower ribs. (Tr. at 404.) Claimant stated that Darvocet did not help with the pain and Dr. Bundy changed his medication to Lortab 5/500 and a Medrol Dosepak. (Id.) If the medication did not help, Dr. Bundy advised that he would order a full evaluation via MRI. (Id.) On examination, Claimant had generalized tenderness with twisting of his upper back but no palpable tender points or trigger points. (Id.) He assessed thoracic back pain with radiation to the right rib. (Id.)

On December 23, 2009, Dr. Bundy completed a Physical Capacities Questionnaire and Assessment Form. (Tr. at 422-25.) Dr. Bundy opined that Claimant's multiple joint pains and stiffness prevented him from working a full eight hour day as a painter and construction worker. (Tr. at 423.) He opined that Claimant's pain constantly would interfere with his ability to concentrate or focus and would cause him to miss more than four days per month. (Tr. at 423-24.) He indicated that Claimant would need a job that permitted him to shift positions at will and that he could stand on his feet or sit for only 30 minutes to one hour before needing to change positions. (Tr. at 424.) Dr. Bundy further opined that Claimant could lift or carry ten pounds occasionally, 20 pounds rarely, and 50 pounds never. (Id.) He could rarely twist, stoop, bend, crouch, or climb ladders, and stairs. (Id.) Dr. Bundy also opined that Claimant was limited in his ability to manipulate his arms and hands and could not reach above shoulders, push/pull repeatedly, or lift repeatedly. (Tr. at 425.) Similarly, Dr. Bundy noted that Claimant had decreased grip and fine motor skills and was unable to perform repetitive motions with his fingers. (Id.) Finally, he opined that Claimant should avoid cold temperatures and humidity. (Id.)

Following the ALJ's hearing, Dr. Bundy submitted a short "Clarification to Physical Capacities Questionnaire Dated 12/23/2009," in which he stated that the restrictions he assessed dated back to his examination of Claimant on August 15, 2006. (Tr. at 426.) Dr. Bundy stated:

Although his condition may have worsened since then, the restrictions with regard to

10

his postural limitations and ability to manipulat[e] his arms and hands including reaching, pushing, pulling and performing repetitive motions with his fingers existed as of 8/15/2006.

(Id.)

**Clare Weldman, M.D.**:

Claimant was examined on May 13, 2008, by Dr. Weldman for complaints of multiple joint pain, primarily in his right shoulder, knees, and ankles. (Tr. at 344, 367.) On examination, Dr. Weldman observed that Claimant had full range of bilateral knee motion with moderate crepitus. (Id.) His knees were stable and with no effusion. (Id.) Examination of the ankles revealed some swelling of the left ankle but no crepitus. (Id.) Dr. Weldman suggested that Claimant take Naprosyn 500mg and try Osteo Bi-Flex or Glucosamine and chondroitin sulfate, for six weeks. (Id.) If he continued to have problems after six weeks, Dr. Weldman suggested that Claimant return with the films and studies obtained by Dr. Bundy. (Id.)

**Kip Beard, M.D.**:

**First Exam:**

Claimant underwent a consultative examination at the request of the state agency by Dr. Beard on November 22, 2006. (Tr. at 247-56.) Claimant reported an increased chronic productive cough and wheezing over the last two years, triggered by dust and scented candles, and a history of smoking one pack of cigarettes per day. (Tr. at 247.) He reported a several year history of joint pain in the elbows, shoulders, knees, and ankles. (Id.) His right ankle was fractured in a motorcycle accident and was treated surgically. (Id.) Claimant reported constant pain of the shoulders, knees, and ankles, with intermittent elbow pain. (Id.) The pain awakens him from sleep. (Id.) He reported tenderness of the shoulders, knees, and ankles with swelling of the knees. (Id.) Elbow pain is increased with lifting, pushing, or pulling on objects. (Id.) His shoulder pain is worse with overhead use, reaching, or lifting.

11

(Tr. at 247-48.) Claimant reported a catch in the right shoulder. (Tr. at 248.) Pain in the knees and ankles is worse with prolonged walking, standing, or trying to squat. (Id.) He stated that Naprosyn was minimally helpful for pain. (Id.) Claimant also reported a history of hypothyroidism. (Id.)

Physical examination revealed that Claimant had a normal gait, was able to stand unassisted, was able to arise from a seat, and step up and down from the exam table without difficulty. (Tr. at 249.) Dr. Beard noted that Claimant appeared comfortable seated and supine. (Id.) Examination of the chest revealed some mild wheezes and rhonchi without rales with a very mild degree of dyspnea following exertion without accessory muscle recruitment. (Tr. at 250.) Cervical spine flexion and extension were at 50 degrees but the exam otherwise was normal without complaints. (Id.) Examination of the shoulders revealed some slight AC crepitus and some mild pain on range of motion testing with some mild tenderness. (Id.) Examination of the elbows and wrists was unremarkable. (Id.) Claimant was able to grip his hands, button and pick up coins with either hand, write with the dominant hand without difficulty, and perform range of motion testing without limitations. (Id.) Examination of the knees revealed some mild genu varus alignment. (Id.) He complained of some mild pain on motion testing with knee tenderness and some patellofemoral crepitus. (Id.) Dr. Beard noted some laxity about the left knee to varus stress and mild anterior laxity. (Id.) The right knee revealed some mild anterior laxity. (Id.) Bilateral flexion was to 130 degrees with normal range of motion otherwise. (Id.) Examination of the ankles revealed some mild crepitus of the right ankle with some mild pain with tenderness and mild swelling. (Tr. at 251.) Range of motion of the bilateral ankles was normal. (Id.) Claimant was able to stand on one leg at a time without difficulty. (Id.) Straight leg raising test was to 90 degrees bilaterally in the supine and seating positions without complaints. (Id.) He was able to heel walk, toe walk, and tandem walk with ankle pain. (Id.) He was able to squat with knee pain. (Id.)

12

Dr. Beard assessed osteoarthritis; right ankle/heel fracture, open reduction and internal fixation with posttraumatic osteoarthritis; chronic obstructive pulmonary disease/chronic bronchitis; and hypothryroidism. (Tr. at 251.)

**Second Exam**:

Claimant underwent a second consultative examination at the request of the state agency by Dr. Beard on December 4, 2007. (Tr. at 294-98.) Claimant reported that he had experienced several years of increasing joint paint in all of his joints. (Tr. at 294.) He reported that he had increased trouble with his ankles, that his knees gave away, and that he had grinding at the shoulders. (Id.) Claimant described the pain as constant with tenderness to the joints. (Id.) He was unable to grip anything due to hand, wrist, and elbow pain. (Id.) He stated that shoulder pain was worse with overhead reaching, lifting, or carrying, or when taking off his shirt. (Id.) Hip, knee, ankle, and foot pain was made worse with walking, especially on unlevel surfaces; climbing ladders; squatting; kneeling; or crawling. (Id.) His pain was worse with prolonged standing for any period of time. (Id.) Claimant reported that Naproxen helped a little bit with pain. (Id.) Dr. Beard noted that a May 2006, chest x-ray revealed hyperinflation which was suggestive of chronic obstructive pulmonary disease. (Tr. at 295.)

Dr. Beard noted on physical examination that Claimant required no ambulatory aids, was able to stand unassisted, was able to arise from a seat, and could step up and down from the exam table. (Tr. at 296.) Claimant appeared comfortable while seated and mildly uncomfortable standing. (Id.) Claimant had some stiffness of the cervical spine with motion testing. (Id.) Examination of the shoulders revealed bilateral AC crepitus with some mild pain on motion testing with some tenderness. (Tr. at 297.) The elbows and wrists were without pain and were within normal range of motion. (Id.) The hands revealed no tenderness, redness, warmth, or swelling. (Id.) There was no atrophy and Claimant was able to make a fist bilaterally, pick up coins with either hand, and write with the

13

dominant hand without difficulty. (Id.) Range of hand motion revealed no limitations. (Id.) Examination of the knees revealed some mild pain with tenderness and mild bilateral effusions, with some intermittent crepitus. (Id.) Flexion bilaterally was 130 degrees with normal range of motion otherwise. (Id.) Examination of the ankles and feet was unremarkable. (Id.) Claimant had normal range of lumbosacral spine motion and was able to stand on one leg alone. (Id.) Straight leg raising test was 90 degrees in the seated and supine positions with some discomfort while supine. (Id.) Examination of the hips was unremarkable. (Id.) Dr. Beard noted that Claimant was able to heel walk, toe walk, tandem walk, and squat with pain. (Id.)

Dr. Beard's impression was osteoarthritis. (Tr. at 297.) He summarized that Claimant had a history of chronic joint pain and that his examination revealed some joint crepitus, more so at the shoulders and a little bit at the knees. (Tr. at 298.) Dr. Beard noted that Claimant had some mild range of motions abnormalities but no obvious inflammatory arthritis. (Id.) His gait was within normal l imits. (Id.)

**Physical Residual Functional Capacity Assessments**:

**Amy Wirts, M.D.**:

On December 6, 2007, Dr. Wirts, a state agency consulting physician, reviewed Dr. Beard's initial consultative examination report and treatment notes from the Robert C. Byrd Clinic from May 2006, through August 2006, and opined that Claimant was capable to performing light exertional level work. (Tr. at 259-67.) Due to mild limitations in Claimant's right ankle and heel, Dr. Wirts opined that Claimant was to avoid repetitive pushing, pedaling, and stomping with his lower extremities. (Tr. at 261.) She assessed occasional postural limitations with the exception that he never climb ladders, ropes, or scaffolds. (Tr. at 262.) Dr. Wirts further opined that Claimant should avoid reaching in all directions, including overhead, and should avoid concentrated exposure to temperature extremes,

14

vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 263-64.) Dr. Wirts noted Claimant's activities of daily living to have included watching television, performing personal care with some problems, preparing simple meals, washing dishes, walking, driving and riding in a car, shopping, riding a motorcycle once a week, attending church, going to the movies three to four times a week, visiting his children, and attending cookouts every two weeks. (Tr. at 265.)

**James Egnor, M.D.**:

On December 17, 2007, Dr. Egnor, a state agency reviewing physician, reviewed Dr. Beard's second consultative examination report and treatment notes from the Robert C. Byrd Clinic, and opined that Claimant was capable of performing work at the light exertional level with unlimited push/pull. (Tr. at 306-15.) Dr. Egnor assessed occasional postural limitations and opined that Claimant should avoid concentrated exposure to extreme cold and vibration. (Tr. at 309, 311.) Dr. Egnor noted Claimant's activities of daily living to have included performing self care with problems putting his shirt on overhead, preparing sandwiches and frozen dinners, doing laundry and cleaning, going out daily, driving, shopping once monthly for an hour, riding motorcycles, walking an eighth of a mile, and maintaining an ability to lift forty pounds. (Tr. at 314.)

**Rabah Boukhemis, M.D.**:

On October 28, 2008, Dr. Boukhemis, a state agency reviewing physician, reviewed Dr. Bundy's treatment notes and opined that Claimant was capable of performing light exertional level work with occasional postural limitations and environmental limitations including avoiding concentrated exposure to extreme cold, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 371-78.) Dr. Boukhemis also opined that Claimant should avoid even moderate exposure to workplace hazards, such as machinery and heights. (Tr. at 375.) Dr. Curtis Withrow, M.D., reviewed all the evidence in the file and affirmed Dr. Boukhemis's opinion on December 4, 2008. (Tr.

at 379.)

<u>Analysis</u>.

1. <u>Treating Physician Opinion</u>.

Considering Claimant's arguments out of turn, Claimant alleges that the ALJ erred in not giving great weight to the opinion of his treating physician, Dr. Bundy. (Document No. 14 at 12-15.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id</u>. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling

16

weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant matter, the ALJ gave minimal weight to the opinion of Dr. Bundy, Claimant's treating physician because his records did "not objectively support his opinion because treatments that

17

[were] used during the course of their treating relationship were noted to be effective, as the [C]laimant stated during their visits." (Tr. at 22.) The ALJ gave great weight to the opinions of the state agency medical consultants, Drs. Wirts, Egnor, and Boukhemis, and the state agency consultative examiner, Dr. Beard. (Tr. at 21-22.) The ALJ noted that the state agency medical consultants provided specific reasons for their opinions which indicated that they were grounded in the evidence in the case record. (Tr. at 21.)

The ALJ summarized Dr. Bundy's treatment notes and thereby noted the extent of his treatment relationship with Claimant. (Tr. at 17-19, 21-22.) The ALJ noted that Claimant's symptoms were generally controlled with medication. (Tr. at 21.) He noted that Claimant first was treated with Naprosyn in 2004, and then again in 2006, together with Tramadol, which was effective and was continued for nearly a year. (Tr. at 21, 269-77.) Claimant reported on November 7, 2006, that he had a lot of relief of pain with the Tramadol but was afraid to use it. (Tr. at 272, 338.) From November 7, 2006, through January 7, 2008, the medical records did not reflect any complaints of joint pain by Claimant. (Tr. at 271-72, 334, 337-38, 364.) His medication was not changed until January 7, 2008, when Claimant reported that it no longer was effective, and Claimant changed it to Meloxicam. (Tr. at 21, 334, 364.) Claimant continued the Meloxicam and Proxpoxyphene Acetaminophen for six months, and Claimant reported in October 2008, that the medication worked well. (Tr. at 21, 332, 362.) His medication was changed again on February 10, 2009, to Meclomen, and on June 10, 2009, to Lortab. (Tr. at 405, 406.)

Although Claimant still had some mild complaints of pain and some physical findings on examination, the ALJ found, and the record supported, a finding that his joint pains essentially were controlled with medication. As the Commissioner notes, when a condition can be treated or controlled with medication, it is not considered disabling. See Gross v. Heckler, 785 F.2d 1163, 1165-66 (4th Cir.

1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

Dr. Bundy rendered an opinion on December 23, 2009, which was six months after the ALJ determined that Claimant was entitled to benefits. The ALJ accepted Dr. Bundy's opinion to the extent that he precluded Claimant from returning to his past relevant work as a painter and construction worker, but declined to accept the limitations as they limited Claimant to less than sedentary level work because the various prescribed medications were effective courses of treatment.

The ALJ further noted that prior to May 3, 2009, Claimant's reported activities of daily living were not as limited as one would expect, given his complaints of disabling symptoms and limitations. (Tr. a t 21.) The ALJ noted that on his form Function Report, dated October 19, 2008, Claimant reported that he had no difficulty shaving, bathing, or feeding himself; that he could prepare sandwiches and frozen dinners; that he did laundry and cleaned the house weekly; that he went outside daily; that he drove a car; that he shopped for food weekly for 30 minutes; that he was able to pay bills, count change, handle a savings account, and use a checkbook and money orders; that he rode a motorcycle three or four times a season; and that he attended cookouts with his children, attended church weekly, and went out to eat on a regular basis. (Tr. at 21, 173-80.)

Additionally, the ALJ noted the other opinion evidence of record, including the three state agency medical consultants' opinions and the examinations by Dr. Beard, which were inconsistent with the treatment notes of Dr. Bundy, generally. On exam, Dr. Beard observed only slight shoulder crepitus and mild pain on range of motion testing; unremarkable elbows and wrists; an ability to grip his hands and pick up coins with either hand; mild pain on bilateral knee range of motion testing with knee tenderness and some mild laxity; mild crepitus, swelling, and tenderness of the ankles but normal range of motion; and an ability to perform different walking styles and to squat with knee pain. (Tr. at 249-51.) Dr. Beard's initial assessment, which was conducted along with Dr. Bundy's treatment of

19

Claimant, revealed much more minimal findings than did Dr. Bundy. Dr. Beard's second assessment revealed similar findings. (Tr. at 296-97.) Likewise, Dr. Weldman observed full range of bilateral knee range of motion with moderate crepitus but with stability and no effusion, and some ankle swelling but no crepitus. (Tr. at 344, 367.) Dr. Weldman recommended continued use of Naprosyn. (Id.)

Contrary to Claimant's argument, the ALJ acknowledged Dr. Wirts's opinion and assigned it great weight. (Tr. at 21-22.) Though Dr. Wirts opined that Claimant should avoid reaching in all directions, including overhead, her opinion was based in part on Dr. Bundy's treatment records. (Tr. at 263.) Dr. Beard's examinations revealed only mild pain on motion testing with some crepitus and tenderness. (Tr. at 250, 297.) Likewise, his examinations did not support any limitations respecting Claimant's hands, wrists, or elbows. (Id.) Likewise, Dr. Weldman made no observations respecting Claimant's shoulders or upper extremities despite his complaints of shoulder pain. (Tr. at 344, 367.) Manipulative limitations respecting Claimant's upper extremities therefore, were not supported by the substantial evidence of record.

Accordingly, the Court finds that the ALJ assessed the opinion evidence of record according to the Regulations and that his decision to accord Dr. Bundy's opinion minimal weight is supported by the substantial evidence of record. Claimant's joint pains were responsive to the various medications, though the medications were changed several times throughout his course of treatment. Claimant's argument therefore, is without merit.

2. Medical-Vocational Rules.

Claimant also alleges that the ALJ committed reversible error when he assessed a RFC for less than the full range of full work but entirely relied on Medical-Vocational Rule 202.10 in finding that prior to May 3, 2009, Claimant had the RFC for the full range of light work,  and therefore, was not disabled. (Document No. 14 at 16.) The Regulations provide that when a claimant has an impairment

or combination of impairments, the Medical-Vocational Rules

> are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) (2010). The Regulations further provide however, that when an claimant has a combination of exertional and nonexertional limitations, the Medical-Vocational Rules cannot wholly determine those limitations and "full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each fact in the appropriate sections of the regulations." Id.; See also, SSR 83-14 ("No table rule applies to direct a conclusion of 'Disabled' or 'Not Disabled' where an individual has a nonexertional limitation or restriction imposed by a medically determinable impairment.").

In the instant matter, the ALJ assessed a RFC since June 5, 2006, for "less than the full range of light work," with only occasional postural activities and an avoidance of even moderate exposure to hazards, and an avoidance of concentrated exposure to extreme cold, wetness, humidity, vibrations, and fumes. (Tr. at 20.) The ALJ therefore, assessed a combination of exertional (the strength limitations) and nonexertional limitations (the postural and environmental limitations). See 20 C.F.R. § 404.1569a(b) and (c) (2010). At step five of the sequential analysis, however, the ALJ concluded that prior to May 3, 2009, and based on a RFC for a full range of light work, a finding of "not disabled" was directed by Medical-Vocational Rule 202.10. (Tr. at 22-23.) The undersigned finds that the ALJ erred in making inconsistent RFC findings and in relying entirely on Medical-Vocational Rule 202.10 in view of the combination of exertional and nonexertional limitations. Nevertheless, the undersigned further finds that in view of the ALJ's questioning of the VE at the administrative hearing,

21

that such error is harmless.

At the administrative hearing, the ALJ posed a hypothetical question to the VE based on the RFC assessment by Dr. Boukhemis. (Tr. at 61-62.) As stated above, Dr. Boukhemis opined that Claimant was capable of performing light exertional work with occasional postural limitations; an avoidance of concentrated exposure to extreme cold, wetness, humidity, vibrations, fumes, odors, dusts, gases, and poor ventilation; and an avoidance of even moderate exposure to hazards. (Tr. at 371-78.) The VE testified that based on Dr. Boukhemis's limitations, the Claimant was unable to perform his past relevant work but was able to perform other light level and unskilled jobs such as a packager, hand packager, and small parts assembler. (Tr. at 62-62.) In his decision, the ALJ gave great weight to Dr. Boukhemis's opinion and essentially adopted his opinion in assessing Claimant's RFC. (Tr. at 20.) Consequently, the Court finds that although the ALJ erred in relying solely on the Medical-Vocational Guidelines in finding that Claimant was not disabled, based on the transcript of the administrative hearing, it is clear that the ALJ would have found him able to perform other jobs that existed in significant numbers in the regional and national economies. Accordingly, the Court finds that remanding the decision on this ground would result in the same decision, albeit for different reasons, and therefore, that the ALJ's error is harmless.

3. Pain and Credibility Assessment.

Claimant further alleges that the ALJ erred in assessing his pain and credibility. (Document No. 16 at 16-18.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2010); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the

extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2010). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> > (i) Your daily activities;
> >
> > (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> >
> > (iii) Precipitating and aggravating factors;
> >
> > (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> >
> > (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> >
> > (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> >
> > (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2010).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a

24

claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 20.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 20.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 20-22.) At the second step of the analysis, the ALJ concluded that "the [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 20.)

In assessing Claimant's pain and credibility, the ALJ summarized Claimant's activities as reported at various times. He summarized Claimant's testimony including his limitations  (Tr. at 20.) and as discussed above, his activities as reported on his Function Report from 2008. (Tr. at 21.) The ALJ concluded that Claimant's activities were not as limiting as one would expect given his complaints of disabling symptoms and limitations. (Tr. at 21.)

25

The ALJ also summarized Claimant's treatment, noting his complaints of pain, and noted that his joint pains generally were responsive to medications. (Tr. at 21.) The ALJ noted that the medical records with his treating physician contained no references of complaints of joint pain or any change in treatment for a period of time in excess of one year. (Id.)

Finally, the ALJ considered the opinion evidence of record, as discussed above, and gave great weight to the opinions of the state agency medical consultants and consultative examiner, and little weight to Dr. Bundy. (Tr. at 21-22.) Based on these factors, the ALJ determined that Claimant was not entirely credible. (Tr. at 20.) The Court finds that the ALJ assessed Claimant's pain and credibility pursuant to the factors set forth in the Regulations and finds that the ALJ's decision is supported by the substantial evidence of record. Though Claimant clearly suffers from pain, the medical evidence demonstrates that it is not as disabling as the Claimant alleged.

4. Onset Date of Disability.

Finally, Claimant alleges that the ALJ's decision is arbitrary and not supported by substantial evidence because he erred in failing to find that Claimant was disabled prior to May 3, 2009. (Document No. 14 at 8-12.) Essentially, Claimant alleges that the ALJ erred in not adopting his alleged onset date of disability, June 5, 2006, and finding him disabled from that date forward. Citing SSR 83-20, Claimant asserts that when the medical impairment is a slowly progressive impairment, as was his arthritic condition, the alleged onset date may be difficult to obtain precisely from the record and additional development may be needed. (Id. at 9.) Claimant therefore, had Dr. Bundy submit a clarification to his opinion to reflect that his opinions back dated to his August 2006, exam. (Id.) Claimant asserts however, that the ALJ failed to discuss Dr. Bundy's clarification. (Id.) Citing SSR 83-20, Claimant further asserts that the onset date may be inferred from the medical evidence, and that the treatment notes from Dr. Bundy establish an onset date of June 5, 2006, when he quit working.

26

(Id.)

Claimant correctly notes that pursuant to SSR 83-20, the factors relevant to determining the date of disability onset include the claimant's alleged onset date, his work history, and the medical evidence. See SSR 83-20. The date of work stoppage is significant only if it is consistent with the severity of the conditions shown by the medical evidence. Id. In the instant matter, the ALJ determined that Claimant was disabled on May 3, 2009, which was six months prior to his change of age to 55, or to advanced age under the Regulations. Pursuant to Medical-Vocational Rule 202.01, a finding of disabled was reached when Claimant turned 55. (Tr. at 23.) The ALJ stated at the hearing that he was comfortable taking the date six months prior to that date, which was May 3, 2009. (Tr. at 45.) Prior to May 3, 2009, the medical record indicates that though he quit work on June 5, 2006, he responded to treatment between those two dates, and therefore, was not disabled.

Claimant argues that pursuant to the decision in Bird v. Commissioner of Soc. Sec., 699 F.3d 337, 345-46 (4th Cir. 2012), the ALJ should have consulted with a medical advisor because the date of disability onset was ambiguous. (Document No. 19 at 1.) Given Claimant's change in age, however, combined with Claimant's response to treatment, the onset date of disability was neither ambiguous nor difficult for the ALJ to discern. Though the ALJ did not specifically address in his decision Dr. Bundy's clarification, he stated that he considered all the evidence in rendering his decision. (Tr. at 15.) Furthermore, at the administrative hearing, the ALJ made clear that the medical evidence demonstrated that he was responsive to medication. (Tr. at 45-48.) Though the ALJ should have addressed Dr. Bundy's clarification in his decision, the Court finds that his failure to do so is harmless error as the ALJ declined to adopt Dr. Bundy's opinion and made clear that Claimant was responsive to treatment back to August 2006.

Accordingly, based on the foregoing, the Court finds that the ALJ's decision that Claimant was

27

disabled as of May 3, 2009, due to a change in age is supported by substantial evidence of record. The Court further finds that the ALJ's decision that Claimant was not disabled prior to May 3, 2009, is supported by substantial evidence of record and that his selection of the onset of disability date is supported by the evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 17.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court..

The Clerk of this Court is directed to transmit a copy of this Memorandum Opinion to counsel of record.

ENTER: May 29, 2013.

R. Clarke VanDervort
United States Magistrate Judge